**MARK K. SCHONFELD (MS-2798)**
**Attorney for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**Northeast Regional Office**
**3 World Financial Center**
**New York, NY 10281**
**Telephone No. (212) 336-0140 (Robert H. Murphy)**

CV 06 1274

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAR 21 2006

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

GLASSER, J.   BROOKLYN OFFICE

-------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**

                                    **Plaintiff,**

            **vs.**

**A.B. WATLEY GROUP, INC., PAUL F. COUGHLIN,**
**WILLIAM B. DEAKINS, WARREN R. FELLUS,**
**KEITH M. GELLER, KEEVIN H. LEONARD,**
**ROBERT F. MALIN, STEVEN E. MALIN,**
**LINUS N. NWAIGWE, MICHAEL A. PICONE,**
**BRYAN S. ROGERS, AND KEITH A. ROGERS,**

                                    **Defendants.**

GOLD, M.J.

2006 Civ. _____ ( __ )

**COMPLAINT**

-------------------------------------------------------------------x

Plaintiff Securities and Exchange Commission ("Commission") alleges the following

against Defendants A.B. Watley Group, Inc. ("Watley Group"), Paul F. Coughlin ("Coughlin"),

William B. Deakins ("Deakins"), Warren R. Fellus ("Fellus"), Keith M. Geller ("Geller"),

Keevin H. Leonard ("Leonard"), Robert F. Malin ("Robert Malin"), Steven E. Malin ("Steven

Malin"), Linus N. Nwaigwe ("Nwaigwe"), Michael A. Picone ("Picone"), Bryan S. Rogers ("Bryan Rogers"), and Keith A. Rogers ("Keith Rogers") (collectively, "Defendants"):

### SUMMARY

1.      This case involves a fraudulent "trading ahead" scheme, in which day traders at A.B. Watley, Inc. ("Watley"), a broker-dealer subsidiary of Watley Group, obtained live audio access to institutional equities "squawk boxes" and traded ahead of the customer orders broadcast over the squawk boxes. Squawk boxes are devices that broadcast, within a securities firm, institutional customer orders to buy and sell large blocks of securities. The information broadcast on squawk boxes includes material, non-public information.

2.      More specifically, in 2002, Steven Malin and Robert Malin, Watley Group's Chairman and Vice Chairman respectively, hired John J. Amore as Chief Executive Officer ("CEO") of Watley Group. Amore built a day trading operation at Watley based on his access to information from his contacts in the financial world -- namely his access to the squawk boxes -- to generate revenues for Watley Group.

3.      Amore and Robert Malin, among others, constructed this day trading operation and hired numerous day traders. Watley day traders, including Geller, Fellus, Bryan Rogers, and Keith Rogers, then made arrangements with brokers ("Brokers") employed at firms, including Citigroup Global Markets, Inc. ("Citigroup"), Lehman Brothers, Inc. ("Lehman"), and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill"), to obtain access to their firms' squawk boxes. In exchange for providing this access, Watley traders paid the Brokers, including Coughlin, a broker at Merrill, cash bribes and compensated them through commissions.

2

4.      By providing Amore and the day traders with access to the squawk boxes, the Brokers, including Coughlin, violated their firms' policies and obligations to preserve the confidentiality of information regarding their employers' customer orders.

5.      Day traders working at Watley, including Deakins, Fellus, Geller, Bryan Rogers, and Keith Rogers, listened to the pirated squawk boxes and traded ahead of the institutional orders in order to profit from price movements that resulted from execution of the large customer orders.

6.      Robert Malin and Steven Malin, as well as other members of Watley's and Watley Group's management, including Amore, Leonard, Nwaigwe, and Picone, assisted in the procurement of the squawk box broadcasts, authorized the payment of cash bribes and commissions to the Brokers in exchange for access to the squawk boxes, and transformed Watley into a proprietary day trading firm where the firm's day traders relied on the information broadcast over the squawk boxes to trade ahead of customer orders.

7.      Between at least June 2002 and January 2004, the day traders executed more than 400 trades based on confidential customer order flow information provided by the Brokers, and made at least $675,000 in gross profits.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78u(d).  In this action, the Commission is seeking: (a) permanent injunctive relief against all of the Defendants; (b) disgorgement plus prejudgment interest from all of the Defendants; (c) civil penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Sections 21(d) and 21(A)

3

of the Exchange Act, 15 U.S.C. § 78u(d) and 15 U.S.C. § 78u-1, from all of the Defendants; (d)

officer and director bars pursuant to Section 20(e) of the Securities Act, 15 U.S.C. § 77t(e), and

Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), against Robert Malin, Steven

Malin, and Picone; and (e) such further relief as the Court may deem appropriate.

      9.      This Court has subject matter jurisdiction over this action pursuant to Section

22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C.

§ 78aa.

      10.      Venue lies in this district pursuant to Section 22(a) of the Securities Act, 15

U.S.C. § 77v(a), and Section 27 of the Exchange Act, 15 U.S.C. § 77aa, because, among other

things, certain of the transactions, acts, practices, and courses of business occurred in the Eastern

District of New York.  For example, two of the brokers who allowed the Watley traders to listen

to the Merrill squawk box, Timothy J. O'Connell ("O'Connell") and Kenneth E. Mahaffy, Jr.

("Mahaffy"), were employed at Merrill's office in Garden City, New York.  Additionally, Fellus

resides in Roslyn, New York, Bryan Rogers resides in East Meadow, New York, and Keith

Rogers resides in Franklin Square, New York.

      11.      The Defendants, directly or indirectly, singly and in concert, made use of the

means or instruments of transportation or communication in, and the means or instrumentalities

of, interstate commerce, or of the mails, in connection with the transactions, acts, practices and

courses of business alleged herein.

## STATUTES AND RULE ALLEGED TO HAVE BEEN VIOLATED

      12.      The Defendants have engaged, and unless enjoined, will continue to engage,

directly or indirectly, in transactions, acts, practices, and courses of business that constitute

violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections 10(b) and

15(c) of the Exchange Act, 15 U.S.C. § 78j(b) and 15 U.S.C. § 78o(c), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## DEFENDANTS

13.     Watley Group, a Delaware corporation, is a publicly-traded holding company that conducts its business through broker-dealer subsidiaries, including Watley, that are or were engaged in equities trading for institutional and retail customers.

14.     Coughlin, age 34, is a resident of New York, New York. From December 1993 through December 2005, Merrill employed Coughlin as a sales assistant and later as a registered representative (or broker) in New York City. Coughlin has a Series 7 license.

15.     Deakins, age 37, is a resident of Dobbs Ferry, New York. From February 2002 through mid-August 2003, Deakins was a proprietary trader at Watley. From late August 2003 through February 2004, Deakins was the manager of Watley's proprietary trading desk. Deakins has Series 7 and 24 licenses.

16.     Fellus, age 34, is a resident of Roslyn, New York. From February 2002 through May 2003, Fellus was a proprietary trader at Watley. From May 2003 through December 2003, Fellus was the head of the proprietary trading desk at another broker-dealer headquartered in Woodcliff Lake, New Jersey ("Broker-Dealer A"). Fellus has a Series 7 license.

17.     Geller, age 31, is a resident of New York, New York. From February 2002 through January 2004, Geller was a proprietary trader at Watley. Geller has a Series 7 license.

18.     Leonard, age 45, is a resident of Montvale, New Jersey. From February 2002 through March 2003, Leonard was a manager of the proprietary trading desk at Watley. Leonard was also a general securities principal at Watley. Leonard has Series 7 and 24 licenses.

19.     Robert Malin, age 41, is a resident of New York, New York. Robert Malin was Vice Chairman of the Board of Directors at Watley Group from approximately January 1999 through the present. Robert Malin also served as President of Watley from approximately September 2002 through April 2004. Robert Malin has Series 7 and 24 licenses.

20.     Steven Malin, age 49, is a resident of New York, New York. From approximately August 1993 through December 1996, Steven Malin was employed as a consultant at Watley Group. Steven Malin at times was CEO of Watley Group. Since May 1996, Steven Malin has been the Chairman of the Board of Directors at Watley Group.

21.     Nwaigwe, age 49, is a resident of Valley Stream, New York. From October 2001 through April 2004, Nwaigwe was director of compliance at Watley. Nwaigwe has Series 7 and 24 licenses.

22.     Picone, age 50, is a resident of New York, New York. Picone was the Chief Operating Officer of and later a consultant to Watley Group. Picone has a Series 7 license.

23.     Bryan Rogers, age 35, is a resident of East Meadow, New York. Bryan Rogers was a proprietary trader at Watley's headquarters from February 2002 through September 2003. Bryan Rogers has a Series 7 license.

24.     Keith Rogers, age 32, is a resident of Franklin Square, New York. From February 2002 through September 2003, Keith Rogers was a proprietary trader at Watley. Keith Rogers has a Series 7 license.

## RELATED ENTITIES AND INDIVIDUALS

25.     Watley was a registered broker-dealer headquartered in New York, New York. Watley's broker-dealer registration was terminated in April 2004. From approximately June

2002 through September 2003, over half of Watley's revenue derived from trading securities for the firm's own account, principally day trading.

26.     Amore, age 43, is a resident of Manhasset, New York. Watley first employed Amore as a consultant to grow the firm's day trading business. Watley then promoted Amore to CEO of Watley Group in or around April 2002. Amore, among others, was responsible for establishing and managing Watley's proprietary trading desk, which consisted of day traders who traded the firm's capital. On August 15, 2005, the Commission filed a civil enforcement action against Amore and others. SEC v. Amore et al., CV-05-3885 (E.D.N.Y.).

27.     Ralph D. Casbarro ("Casbarro"), age 44, is a resident of Bayside, New York. From February 1995 through March 2005, Citigroup employed Casbarro as a broker in an office in New York City. Casbarro has a Series 7 license. The Commission filed a civil enforcement action against Casbarro on August 15, 2005. SEC v. Amore et al., CV-05-3805 (E.D.N.Y.).

28.     David G. Ghysels ("Ghysels"), age 48, is a resident of West Palm Beach, Florida. From March 2001 through March 2003, Lehman employed Ghysels as a broker in its Palm Beach, Florida office. From April 2003 through May 2005, Citigroup employed Ghysels as a broker in its Boca Raton, Florida office. Ghysels has a Series 7 license. The Commission filed a civil enforcement action against Ghysels on August 15, 2005. SEC v. Amore et al., CV-05-3805 (E.D.N.Y.).

29.     Mahaffy, age 50, is a resident of Huntington, New York. From December 1997 through February 2003, Merrill employed Mahaffy in its Garden City, New York office. From February 2003 through June 2005, Mahaffy was employed as a broker at Citigroup in its Melville, New York office. Mahaffy has a Series 7 license. The Commission filed a civil

enforcement action against Mahaffy on August 15, 2005.  SEC v. Amore et al., CV-05-3805
(E.D.N.Y.).

      30.     O'Connell, age 42, is a resident of Carle Place, New York.  From August 1997
through February 2005, Merrill employed O'Connell in its Garden City, New York office.
O'Connell has a Series 7 license.  The Commission filed a civil enforcement action against
Mahaffy on August 15, 2005.  SEC v. Amore et al., CV-05-3805 (E.D.N.Y.).

## FACTUAL ALLEGATIONS

### Squawk Boxes as Internal Communication Systems

      31.     At securities firms, a "squawk box" is a loudspeaker connected to an intercom
system that is used to broadcast market-related information to other employees within that firm.
Within institutional equities departments at securities firms, including Citigroup, Lehman, and
Merrill, traders use squawk boxes to announce to colleagues within the firm that an institutional
customer or the firm's own proprietary trading desk has placed a large block order in a certain
stock.

      32.     A trader announces a pending order on the squawk box when attempting to fill the
order by finding a contra party among the firm's other customers (rather than filling the order
through an exchange or an electronic marketplace).  Institutional sales traders and brokers who
hear the order over the squawk box may then contact institutional customers to see if they are
interested in filling or partly filling the other side of the pending block order.

      33.     Institutional customers expect their brokers to preserve the confidentiality of
information regarding the customers' market activities, including orders to buy or sell securities.
Customers require confidentiality for several reasons, including:  (a) the possibility that
knowledge of a pending order would adversely affect the price at which the securities firm could

8

execute the order; (b) the possibility that other market participants could discern the identity of the customer, to the possible detriment of the customer's market strategies; and (c) generally, as a critical aspect of the relationship of trust that the customer has with its broker. Customers authorize brokers to divulge sufficient information about their orders to assist in executing the orders, but do not authorize brokers to divulge information about their orders to other persons, such as day traders who plan to trade ahead of their orders.

34. Because squawk boxes are intended for internal use at securities firms and contain information that is not widely disseminated to the investing public, the customer order information announced on them is non-public.

35. Institutional customer orders are material information that a reasonable investor would want to know because of the potential impact of a large customer order on the prevailing price of a security.

Citigroup, Lehman, and Merrill Policies Protected<br>the Confidentiality of Customer Order Information

36. A compliance memorandum that Citigroup distributed to all of its employees, including Casbarro, Ghysels, and Mahaffy, states, in relevant part, that "confidential information concerning a transaction may be shared with other participants in the transaction only to the extent necessary to effect the transaction and only insofar as is consistent with your obligation to serve the client's interests." The memorandum also states that "examples of confidential information include information about a client's ... pending orders" and that Citigroup's employees have a "duty to keep nonpublic information confidential and to use it solely for the purpose for which it was provided."

9

37.     The brokers at Citigroup, including Casbarro and Mahaffy, were required to adhere to the terms of the compliance memorandum, and to observe industry standards for protecting confidential customer information.

38.     Lehman's policy manual states, in relevant part, that "if an employee has information about a client's pending order and the employee has reason to believe that the placement or execution of the order may affect the price of the security, the employee is prohibited from buying, selling or recommending the purchase or sale of, the security for any other account to take advantage of the anticipated change in price."

39.     Brokers at Lehman, including Ghysels, were required to adhere to the terms of Lehman's policy manual, and to observe industry standards for protecting confidential customer information.

40.     Merrill's policy manual states, in relevant part, that "[i]nformation on client orders may not be disclosed to any other person for other than bona fide business purposes, or used as the basis of any solicitation."

41.     Brokers at Merrill, including Coughlin, Mahaffy, and O'Connell, were required to adhere to the terms of Merrill's policy manual, and to observe industry standards for protecting confidential customer information.

> **Robert Malin, Steven Malin, and Amore Established a Day-Trading Operation**
> **That Improperly Relied on Trading Ahead of Orders Broadcast on Squawk Boxes**

42.     In early 2002, Watley was an online brokerage firm that served mostly remote customers.

43.     In or around March 2002, Amore was working as a consultant at Watley Group. While working as a consultant, Amore persuaded Robert and Steven Malin that he could

generate revenues for Watley Group by building a day trading desk at Watley that relied on his access to information from his contacts in the financial world.

44.     Robert Malin and Steven Malin then authorized the re-structuring of Watley primarily from an online brokerage firm to a proprietary trading firm in which day traders traded Watley's capital.

45.     By June 2002, Watley had established a day trading desk of at least 20 day traders.

46.     In approximately August 2002, Robert Malin and Steven Malin hired Amore as CEO of Watley Group.

47.     Watley, Amore, and Robert Malin then recruited and hired more individuals to act as proprietary day traders.

48.     Watley management and its traders, including Amore, Bryan Rogers, Keith Rogers, and Leonard, taught the newly hired Watley traders how to trade ahead of customer order information broadcast over the squawk boxes.

49.     As will be discussed below, the day traders then traded ahead of customer orders broadcast over the squawk boxes.

50.     Steven Malin knew that the Watley day traders relied on the information broadcast over the squawk boxes when placing trades.

51.     Additionally, in 2002, Amore, Robert Malin, and Steven Malin discussed the necessity of paying the Brokers, including paying them through commissions, in order to obtain access to the squawk boxes.

The Watley Traders Traded Ahead of the Orders Broadcast
Over the Citigroup, Lehman, and Merrill Squawk Boxes

52.     From approximately March 2002 until September 2003, Watley proprietary traders, including Bryan Rogers and Keith Rogers, telephoned the Brokers at the beginning of each trading day to initiate that day's squawk box connection.

53.     After receiving the information about a particular large institutional order over the Citigroup, Lehman, or Merrill squawk boxes, the Watley traders bought or sold (including short sales) the same security in expectation of a movement in the stock price as a result of Citigroup, Lehman, or Merrill executing the large order.

54.     As or after, Citigroup, Lehman, or Merrill executed the institutional purchase or sell order for the particular security, and the stock price increased or decreased, the Watley traders sold the position that they had purchased, or covered the position that they had sold.

55.     Between at least June 2002 and February 2004, the Watley traders, including Deakins, Fellus, Geller, Bryan Rogers, and Keith Rogers, placed over 400 trades based on the order flow information provided by the Brokers, including Casbarro, Coughlin, Ghysels, Mahaffy, and O'Connell, and made at least $675,000 in gross profits.

56.     The Watley traders made at least $25,000 in gross profits based on the order flow information provided by Coughlin during the period October 2003 through January 2004.

57.     The following are examples of trading ahead.  Shortly before 9:52 a.m. on July 24, 2002, while Casbarro was providing an open phone line between his office at Citigroup and Watley's headquarters, a Citigroup trader announced a block order to sell Noble Corp. stock over the Citigroup squawk box.  From 9:52 a.m. through 9:55 a.m., over ten Watley traders, including Deakins, Fellus, Bryan Rogers, and Keith Rogers, sold short at least 36,000 shares of Noble Corp. stock at an average price of approximately $28.63.  From 9:56 a.m. through 9:57 a.m.,

Citigroup executed at least one large sell order of Noble Corp. stock. From 9:56 a.m. through 9:57 a.m., the Watley traders purchased at least 36,000 shares of Noble Corp. stock at an average price of approximately $28.10 per share. The fall in share price resulted in the Watley traders making a gross profit of at least $19,000.

58.      Shortly before 9:54 a.m. on January 28, 2003, while Casbarro was providing an open phone line between his office at Citigroup and Watley's headquarters, a Citigroup trader announced a block order to buy EMC Corp. stock over the Citigroup squawk box. At 9:54 a.m., at least nine Watley traders, including Bill Deakins, Keith Geller, and Bryan Rogers, purchased at least 38,800 shares of EMC Corp. stock at an average price of approximately $7.20 per share. From 9:54 a.m. through 10:18 a.m., Citigroup executed at least one large buy order of EMC Corp. stock. From 9:55 a.m. through 10:19 a.m., the Watley traders sold at least 40,000 shares of EMC Corp. stock at an average price of approximately $7.24 per share and purchased an additional 1,200 shares of EMC Corp. stock. The rise in share price resulted in the Watley traders making a gross profit of at least $1,600.

59.      Shortly before 2:46 p.m. on October 14, 2003, while Coughlin was providing an open phone line between his office at Merrill and Watley's headquarters, a Merrill trader announced a block order to buy Halliburton Co. stock over the Merrill squawk box. At 2:47 p.m., at least three Watley traders took their first position in Halliburton stock for the month of October by purchasing 3,500 shares at $24.02 per share in less than one minute. From 2:47 p.m. through 3:09 p.m., Merrill purchased at least 250,000 shares of Halliburton stock. From 2:54 p.m. through 3:37 p.m., the Watley traders made net sales of 3,100 shares of Halliburton stock at an average price of $24.17. A Merrill trader then announced another block order to buy Halliburton Co. stock over the squawk box at approximately 3:38 pm. From 3:38 p.m. to 3:42

13

p.m., at least four Watley traders purchased 9,500 shares of Halliburton stock at an average price of $24.20. From 3:40 p.m. through 3:44 p.m., Merrill purchased over 100,000 shares of Halliburton stock. From 3:42 through 3:54, the Watley traders sold 8,000 shares of Halliburton stock at an average price of $24.27. The Watley traders made a gross profit of at least $1,331.

60.     Shortly before 12:10 p.m. on November 13, 2003, while Coughlin was providing an open phone line between his office at Merrill and Watley's headquarters, a Merrill trader announced a block order to buy Wyeth stock over the squawk box. From 12:11 p.m. through 12:38 p.m., at least two Watley traders bought at least 4,900 shares of Wyeth stock at an average price of $40.28. From 12:13 p.m. through 12:42 p.m., Merrill bought at least 275,000 shares of Wyeth stock. Between 12:30 p.m. and 12:47 p.m., the Watley traders made net sales of 4,900 shares of Wyeth stock at an average price of $40.59. The Watley traders made a gross profit of over $1,500.

61.     Shortly before 9:43 a.m. on September 23, 2002, while Ghysels was providing an open phone line between his office at Lehman and Watley's headquarters, a Lehman trader announced a block order to sell Supervalu, Inc. stock over the Lehman squawk box. Between 9:43 a.m. and 9:44 a.m., at least eight Watley traders, including Deakins, Geller, and Bryan Rogers, sold short at least 22,000 shares of Supervalu stock at an average price of approximately $17.08 per share. At 9:45 a.m., Lehman executed at least one large sell order of Supervalu stock. At 9:45 a.m., the Watley traders purchased at least 20,000 shares of Supervalu stock at an average price of approximately $17.00 per share. The fall in share price resulted in the Watley traders making a gross profit of at least $1,800.

62.     Shortly before 12:48 p.m. on September 12, 2002, while Ghysels was providing an open phone line between his office at Lehman and Watley's headquarters, a Lehman trader

14

announced a block order to sell Commerce Bancorp, Inc. stock over the Lehman squawk box. Between 12:48 p.m. and 12:50 p.m., at least six Watley traders, including Bryan Rogers, sold short at least 22,000 shares of Commerce Bancorp stock at an average price of approximately $45.15. Between 12:50 p.m. and 12:54 p.m., Lehman executed at least one large sell order of Commerce Bancorp stock. Between 12:50 p.m. and 12:52 p.m., the Watley traders purchased at least 21,000 shares of Commerce Bancorp stock at a price of $45.10 per share. The fall in share price resulted in the Watley traders making a gross profit of at least $1,200.

63.     Shortly before 3:28 p.m. on October 16, 2002, while Mahaffy was providing an open phone line between his office at Merrill and Watley's headquarters, a Merrill trader announced a block sell order in Citigroup, Inc. stock over the Merrill squawk box. Immediately after this announcement, at least 18 Watley traders, including Bill Deakins, Warren Fellus, and Keith Geller, sold short at least 42,000 shares of Citigroup stock at an average price of approximately $33.70 per share. Between 3:28 p.m. and 3:30 p.m., Merrill executed at least one large sell order of Citigroup stock. Between 3:29 p.m. and 3:30 p.m., the Watley traders purchased approximately 38,000 shares to cover most of their short positions at an average price of approximately $33.50 per share. Merrill continued to execute a series of block sell orders of Citigroup stock from 3:31 p.m. through 3:40 p.m., and the Watley traders continued to trade Citigroup stock making sales and short sales of at least 12,000 shares and purchases of at least 16,000 shares. The Watley traders made a gross profit of at least $8,700 from this trading in Citigroup stock.

64.     Shortly before 12:04 p.m. on February 5, 2003, while O'Connell was providing an open phone line between his office at Merrill and Watley's headquarters, a Merrill trader announced a block buy order in American Financial Group, Inc. over the Merrill squawk box.

Immediately after this announcement, at least eight Watley traders, including Geller and Bryan Rogers, bought at least 10,000 shares of American Financial Group stock at a price of $19.79 per share. Between 12:08 p.m. and 12:38 p.m., Merrill executed at least one large buy order of American Financial Group stock. By 12:51 p.m., the Watley traders sold at least 10,000 shares at an average price of approximately $19.99 per share. The rise in share price resulted in the Watley traders making a gross profit of at least $2,000.

### Robert Malin, Steven Malin, Leonard, Nwaigwe, and Picone Managed or Otherwise Participated in the Trading Ahead Scheme

65.     Robert Malin and Amore jointly managed the Watley day trading desk.

66.     Robert Malin routinely reviewed the traders' monthly payout reports, which contained each trader's gross trading profit and expenses. These reports also contained a line item entitled "DAW fees" or done-away fees. A portion of these fees were used to pay the Brokers for providing access to the squawk boxes.

67.     Steven Malin, who along with Robert Malin approved the use of Watley's capital to fund this day trading scheme, told Amore that the information broadcast over the squawk boxes was "value added."

68.     Nwaigwe, the chief compliance officer at Watley, also knew about and approved the trading ahead scheme.

69.     Nwaigwe knew about the presence of squawk boxes throughout Watley's trading floor. Nwaigwe also helped to conceal the scheme from detection.

70.     When an NASD examiner heard the squawk boxes and asked Nwaigwe for an explanation, Nwaigwe responded, falsely, that the sounds were internal communications between traders on different floors at Watley.

16

71.     When confronted with another regulatory examination on Watley's premises, Nwaigwe instructed Amore to transmit the squawk box broadcasts over headphones instead of speakers.

72.     Leonard was a general securities principal at Watley, who actively reviewed the traders' activities.

73.     Leonard instructed traders to trade with the information broadcast over the squawk box.

74.     Leonard installed audio connections to the squawk box broadcasts in Watley's branch office in Forest Hills, New York, and informed the traders about the type of information that was broadcast over the squawk boxes.

75.     Leonard helped ensure that Watley compensated the Brokers for providing access to their firms' squawk boxes, both by facilitating Watley's efforts to generate commissions for the Brokers, and by paying cash bribes to the Brokers.

76.     More specifically, Leonard handled the processing of the trades in Watley's accounts at Citigroup, Lehman, and Merrill that were used to generate commissions to compensate the Brokers.  For example, the Watley day traders often sold shares of a security in one of Watley's accounts at Citigroup, Lehman, or Merrill and then bought an equal number of shares of that security in another of Watley's accounts at Citigroup, Lehman, or Merrill.  These trades had no purpose other than to generate commissions in order to compensate the Brokers. Leonard ensured that these buy and sell trades were processed properly, resulting in Watley covering its position in the security.

77.     Leonard collected cash from the day traders partly to compensate the Brokers.

After Amore Left Watley, Geller, Robert Malin, Steven Malin, and Picone
Obtained Access to the Merrill Squawk Box from Coughlin

78.   In August 2003, Amore was terminated by A.B. Watley Group, Inc.

79.   Amore and the Rogers brothers reacted by denying the Watley traders access to
the squawk box broadcasts.

80.   At or around the time that Amore was fired, Steven Malin offered Keith Rogers
$20,000 per month in exchange for access to the squawk boxes that he could obtain through his
relationships with the Brokers.

81.   Steven Malin further told Keith Rogers that Watley was paying Amore over
$200,000 per year in exchange for access to the squawk boxes.

82.   Steven Malin also told Geller that he wanted to maintain the size of the
proprietary trading desk at Watley and that Watley needed access to squawk boxes.

83.   Steven Malin instructed Picone and Geller to regain audio access to Merrill's
squawk box.

84.   Picone and Geller then attempted to obtain access to the squawk box from Fellus,
who by September 2003, as will be discussed below, was running a proprietary trading desk at
another broker-dealer ("Broker-Dealer A") and had access to the Merrill squawk box.

85.   Picone offered to split the cost of the Merrill squawk box with Fellus.
Specifically, Picone offered to pay commissions to Broker-Dealer A in exchange for access to
the Merrill squawk box.  Broker-Dealer A ultimately declined to provide such access.

86.   Geller later obtained access to the Merrill squawk box directly through a Merrill
broker, Coughlin.

18

87.    In or around October 2003, Geller asked Coughlin to provide access to Merrill's squawk box, which Coughlin was willing to provide in exchange for commissions generated by Watley in an account at Merrill.

88.    Coughlin added a second telephone to his Merrill office for use in transmitting the squawk box broadcasts to Watley.

89.    Geller kept Deakins, Robert Malin, and Picone apprised of his discussions with Coughlin.

90.    A few days after his meeting with Coughlin, Geller obtained access to the Merrill squawk box from him.

91.    Geller began to make cash payments to Coughlin in exchange for access to Merrill's squawk box.

92.    Robert Malin and Picone told Geller that Watley would reimburse him for his cash payments to Coughlin.  Robert Malin and Picone instructed Geller to complete an expense report to obtain reimbursement.

93.    Geller made three cash payments to Coughlin, totaling $4,000, in exchange for Coughlin providing the Watley traders with audio access to the Merrill squawk box from approximately October 2003 through January 2004.

94.    Robert Malin and Picone approved Geller's payments to Coughlin, and Watley reimbursed Geller for these payments.

### Watley Group, Its Management, the Traders, and the Brokers Benefited From the Fraudulent Scheme

95.    The Watley Group, through Watley, earned millions of dollars in processing fees and desk fees from the traders who were participating in the trading ahead scheme.

96.    According to a submission Nwaigwe made to the NASD on September 29, 2003, Watley's day trading desk constituted the majority of Watley's revenue during the period that the trading ahead scheme took place.

97.    Watley charged each day trader ticket charges, which were charges for each trade that the traders placed on Watley's trading platform. Typically, Watley charged the traders a processing fee of between $.0075 and $.01 per share. Watley made over $5 million in processing fees from the Watley day traders from June 2002 through August 2003.

98.    Watley also charged the traders desk fees and done-away fees. In part to justify these fees, Watley promoted the availability of the squawk boxes as an advantage of trading at Watley.

99.    Additionally, Watley obtained a percentage of the profits generated by each trader. Watley therefore received a percentage of the more than $675,000 in gross profits the traders generated from trading ahead of orders broadcast over the squawk boxes.

100.    The traders made profits from trading ahead.

101.    For example, Deakins made at least $40,000 in gross profits based on the information broadcast over the squawk boxes.

102.    Fellus made at least $30,000 in gross profits from approximately July 2002 through August 2003 based on the information broadcast over the squawk boxes at Watley.

103.    Geller made at least $15,000 in gross profits based on the information broadcast over the squawk boxes.

104.    In addition to the salary he received from Watley for obtaining access to the squawk boxes, Keith Rogers made at least $30,000 in gross profits based on the information broadcast over the squawk boxes.

20

105.    In addition to the salary he received from Watley for obtaining access to the squawk boxes, Bryan Rogers made at least $20,000 in gross profits based on the information broadcast over the squawk boxes.

106.    The officers, managers, and other employees at Watley Group and Watley also improperly benefited from the trading ahead scheme through their salaries and other compensation.

107.    Watley management, including Amore, Robert Malin, Leonard, and Picone authorized day traders, including, Geller, Bryan Rogers, and Keith Rogers, to compensate Brokers, including, Casbarro, Coughlin, Ghysels, Mahaffy and O'Connell through commissions and/or secret cash bribes.

108.    As described above, the Watley traders generated commissions for the Brokers by placing matching buy and sell orders with the Brokers, thereby creating commissions without incurring the risk associated with holding a position in a security.

109.    The Watley traders, including Bryan Rogers and Keith Rogers, generated approximately $70,000 in gross commissions for Casbarro.

110.    In addition, Bryan Rogers made secret cash payments to Casbarro for providing access to Citigroup's squawk box.

111.    Robert Malin and Picone authorized Geller to make cash payments of at least $3,000 to Coughlin and to obtain reimbursement from Watley Group for the cash that Geller advanced from his own funds.

112.    The Watley traders, including Bryan Rogers and Keith Rogers, generated approximately $20,000 in gross commissions for Ghysels.

21

113.    The Watley traders, including Bryan Rogers and Keith Rogers, generated approximately $60,000 in gross commissions for Mahaffy and O'Connell at Merrill.

114.    In addition, Leonard gave Keith Rogers cash to make a secret cash payment to Mahaffy for providing access to Merrill's squawk box.

115.    After Mahaffy left Merrill, the Watley traders, including Bryan Rogers and Keith Rogers, generated approximately $140,000 in gross commissions for O'Connell at Merrill.

116.    After Mahaffy began working at Citigroup, the Watley traders, including Bryan Rogers and Keith Rogers, generated approximately $20,000 in gross commissions for Mahaffy.

### Fellus Established a Proprietary Trading Desk at Another Broker-Dealer that Relied on the Information Transmitted Over the Squawk Boxes

117.    In May 2003, Fellus left Watley to establish a proprietary trading desk at Broker-Dealer A.

118.    Fellus recruited over 20 former Watley day traders to work at Broker-Dealer A.

119.    Fellus then obtained access to Merrill's squawk box from brokers at Merrill.

120.    As at Watley, the Broker-Dealer A day traders traded ahead of institutional orders announced over the Merrill squawk box.

121.    Fellus compensated the brokers at Merrill through commissions generated in accounts that Broker-Dealer A and hedge funds associated with Broker-Dealer A opened at Merrill.

122.    Between at least May 2003 and December 2003, the Broker-Dealer A traders placed over 75 trades based on the order flow information that the Merrill brokers provided. The Broker-Dealer A traders made at least $125,000 in gross profits on these trades.

123.    For example, shortly before 11:58 a.m. on September 17, 2003, while Merrill brokers were providing an open phone line between their offices at Merrill and Broker-Dealer

22

A's day-trading desk, a Merrill trader announced a block order to sell Fair Isaac Corporation stock over the squawk box. From 11:59 a.m. through 12:01 p.m., at least six Broker-Dealer A traders, including Fellus, sold short 9,100 shares of Fair Isaac stock at an average price of $59.57. From 12:01 p.m. through 12:05 p.m., Merrill sold at least 212,000 shares of Fair Isaac stock. From 12:01 p.m. through 12:05 p.m., the Broker-Dealer A traders made net purchases of 9,100 shares of Fair Isaac at an average price of $58.78 per share. The Broker-Dealer A traders made a gross profit of over $7,200 by trading ahead of this order.

124.    Fellus traded ahead of numerous Merrill customer orders at Broker-Dealer A, and made over $40,000 in gross profits from these trades.

125.    Additionally, Fellus earned over $80,000 in processing fees, which was a portion of the over $350,000 in processing fees generated by Broker-Dealer A's day traders.

## FIRST CLAIM FOR RELIEF

Watley Group Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

126.    The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

127.    By virtue of the conduct described above, Watley Group, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

23

128. As part of and in furtherance of this violative conduct, the Watley Group knowingly or recklessly participated in a fraudulent scheme by, among other things, directing Watley's day traders to trade ahead of institutional customer orders based on information regarding these orders received from Casbarro, Coughlin, Ghysels, Mahaffy and O'Connell, who all breached a duty owed to their firms and/or their firms' customers.

129. By reason of the acts and practices described above, Watley Group, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## SECOND CLAIM FOR RELIEF

### Deakins Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

130. The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

131. By virtue of the conduct described above, Deakins, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

132. As part of and in furtherance of this violative conduct, Deakins knowingly or recklessly participated in a fraudulent scheme to trade ahead of institutional customer orders

24

based on information regarding these orders broadcast over the Citigroup, Lehman, and/or

Merrill squawk boxes, and/or he engaged in illegal insider trading by trading ahead of these

orders.

133.    When Deakins traded ahead of Citigroup, Lehman, and/or Merrill customer

orders, he knew, or was reckless in not knowing, that the information that he received over the

squawk boxes concerning these orders was material and non-public and had been communicated

to him as a result of a breach of fiduciary duty or other similar duty arising out of a relationship

of trust and confidence.

134.    By reason of the acts and practices described above, Deakins, singly or in concert,

directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a)

of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

### THIRD CLAIM FOR RELIEF

Fellus Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

135.    The Commission realleges and incorporates by reference each and every

allegation contained in the paragraphs above.

136.    By virtue of the conduct described above, Fellus, in the offer or sale, and in

connection with the purchase or sale of securities, by the use of the means or instrumentalities of

interstate commerce, or of the mails, or of any facility of any national securities exchange: (1)

employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or

otherwise made, untrue statements of material facts or omitted to state material facts necessary in

order to make the statements made, in the light of the circumstances under which they were

made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

137.   As part of and in furtherance of this violative conduct, Fellus knowingly or recklessly participated in a fraudulent scheme to trade ahead of institutional customer orders based on information regarding these orders broadcast over the Citigroup, Lehman, and/or Merrill squawk boxes, and/or he engaged in illegal insider trading by trading ahead of these orders.

138.   When Fellus traded ahead of Citigroup, Lehman, and/or Merrill customer orders, he knew, or was reckless in not knowing, that the information that he received over the squawk boxes concerning these orders was material and non-public and had been communicated to him as a result of a breach of fiduciary duty or other similar duty arising out of a relationship of trust and confidence.

139.   By reason of the acts and practices described above, Fellus, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

### FOURTH CLAIM FOR RELIEF

Geller Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

140.   The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

141.   By virtue of the conduct described above, Geller, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1)

employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

142.    As part of and in furtherance of this violative conduct, Geller knowingly or recklessly participated in a fraudulent scheme to trade ahead of institutional customer orders based on information regarding these orders broadcast over the Citigroup, Lehman, and/or Merrill squawk boxes, and/or he engaged in illegal insider trading by trading ahead of these orders.

143.    When Geller traded ahead of Citigroup, Lehman, and/or Merrill customer orders, he knew, or was reckless in not knowing, that the information that he received over the squawk boxes concerning these orders was material and non-public and had been communicated to him as a result of a breach of fiduciary duty or other similar duty arising out of a relationship of trust and confidence.

144.    By reason of the acts and practices described above, Geller, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## FIFTH CLAIM FOR RELIEF

### Bryan Rogers Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

145.    The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

27

146.   By virtue of the conduct described above, Bryan Rogers, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

147.   As part of and in furtherance of this violative conduct, Bryan Rogers knowingly or recklessly participated in a fraudulent scheme to trade ahead of institutional customer orders based on information regarding these orders broadcast over the Citigroup, Lehman, and/or Merrill squawk boxes, and/or he engaged in illegal insider trading by trading ahead of these orders.

148.   When Bryan Rogers traded ahead of Citigroup, Lehman, and/or Merrill customer orders, he knew, or was reckless in not knowing, that the information that he received over the squawk boxes concerning these orders was material and non-public and had been communicated to him as a result of a breach of fiduciary duty or other similar duty arising out of a relationship of trust and confidence.

149.   By reason of the acts and practices described above, Bryan Rogers, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## SIXTH CLAIM FOR RELIEF

Keith Rogers Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

150.    The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

151.    By virtue of the conduct described above, Keith Rogers, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

152.    As part of and in furtherance of this violative conduct, Keith Rogers knowingly or recklessly participated in a fraudulent scheme to trade ahead of institutional customer orders based on information regarding these orders broadcast over the Citigroup, Lehman, and/or Merrill squawk boxes, and/or he engaged in illegal insider trading by trading ahead of these orders.

153.    When Keith Rogers traded ahead of Citigroup, Lehman, and/or Merrill customer orders, he knew, or was reckless in not knowing, that the information that he received over the squawk boxes concerning these orders was material and non-public and had been communicated to him as a result of a breach of fiduciary duty or other similar duty arising out of a relationship of trust and confidence.

29

154.    By reason of the acts and practices described above, Keith Rogers, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

### SEVENTH CLAIM FOR RELIEF

Leonard Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange·Act and Rule 10b-5 Thereunder

155.    The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

156.    By virtue of the conduct described above, Leonard, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

157.    As part of and in furtherance of this violative conduct, Leonard knowingly or recklessly participated in the fraudulent scheme by, among other things, directing Watley's day traders to trade ahead of institutional orders based on information regarding these orders received over the squawk boxes, and by arranging to pay cash bribes to the Brokers.

158.    By reason of the acts and practices described above, Leonard, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a)

30

of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b),

and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

### EIGHTH CLAIM FOR RELIEF

Robert Malin Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

159.    The Commission realleges and incorporates by reference each and every
allegation contained in the paragraphs above.

160.    By virtue of the conduct described above, Robert Malin, in the offer or sale, and
in connection with the purchase or sale of securities, by the use of the means or instrumentalities
of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1)
employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or
otherwise made, untrue statements of material facts or omitted to state material facts necessary in
order to make the statements made, in the light of the circumstances under which they were
made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a
fraud or deceit upon the purchasers or sellers of numerous securities.

161.    As part of and in furtherance of this violative conduct, Robert Malin knowingly or
recklessly participated in the fraudulent scheme by, among other things, transforming Watley
into a proprietary day trading firm where the firm's day traders relied on the information
broadcast over the squawk boxes to trade ahead of customer orders.

162.    By reason of the acts and practices described above, Robert Malin, singly or in
concert, directly or indirectly, violated, and unless permanently enjoined will again violate,
Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15
U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

31

## NINTH CLAIM FOR RELIEF

Steven Malin Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

163.    The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

164.    By virtue of the conduct described above, Steven Malin, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

165.    As part of and in furtherance of this violative conduct, Steven Malin knowingly or recklessly participated in the fraudulent scheme by, among other things, instructing Geller and Picone to obtain access to the Merrill squawk box after Amore left Watley to maintain Watley's trading ahead operations.

166.    By reason of the acts and practices described above, Steven Malin, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

32

## TENTH CLAIM FOR RELIEF

In the Alternative, Steven Malin Aided and Abetted Violations of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

167.    The Commission realleges and incorporates by reference each and every
allegation contained in the paragraphs above.

168.    Watley Group, Deakins, Fellus, Geller, Keith Rogers, and Bryan Rogers, among
others, in connection with the purchase or sale of securities, by the use of the means or
instrumentalities of interstate commerce, or of the mails, or of any facility of any national
securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue
statements of material facts or omitted to state material facts necessary in order to make the
statements made, in the light of the circumstances under which they were made, not misleading;
or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon
the purchasers or sellers of numerous securities, and therefore violated Section 10(b) of the
Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

169.    Steven Malin knew that Watley Group, Watley, and its officers and/or employees
engaged in a fraudulent trading ahead scheme involving Watley's day traders trading ahead of
institutional customer orders based on information regarding these orders received from the
Brokers.

170.    Steven Malin substantially assisted the fraudulent activity described above.  For
example, Steven Malin instructed Geller and Picone to obtain access to the Merrill squawk box
after Amore left Watley.

171.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason
of the foregoing, Steven Malin, singly or in concert, directly or indirectly, aided and abetted and

33

unless enjoined will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## ELEVENTH CLAIM FOR RELIEF

Picone Violated Section 17(a) of the Securities Act,
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

172.   The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

173.   By virtue of the conduct described above, Picone, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

174.   As part of and in furtherance of this violative conduct, Picone knowingly or recklessly participated in the fraudulent scheme by, among other things, authorizing the reimbursement of the cash bribes that Geller paid to Coughlin.

175.   By reason of the acts and practices described above, Picone, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

34

## TWELFTH CLAIM FOR RELIEF

In the Alternative, Picone Aided and Abetted Violations of Section 17(a) of the
Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

176.    The Commission realleges and incorporates by reference each and every
allegation contained in the paragraphs above.

177.    Watley Group, Deakins, and Geller, among others, in connection with the
purchase or sale of securities, by the use of the means or instrumentalities of interstate
commerce, or of the mails, or of any facility of any national securities exchange: (1) employed
devices, schemes, or artifices to defraud; (2) made untrue statements of material facts or omitted
to state material facts necessary in order to make the statements made, in the light of the
circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or
courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous
securities, and therefore violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and
Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

178.    Picone knew that Watley Group, Watley, and its officers and/or employees
engaged in a fraudulent trading ahead scheme involving Watley's day traders trading ahead of
institutional customer orders based on information regarding these orders received from the
Brokers.

179.    Picone substantially assisted the fraudulent activity described above.  For
example, Picone authorized the reimbursement of the cash bribes that Geller paid to Coughlin.

180.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason
of the foregoing, Picone, singly or in concert, directly or indirectly, aided and abetted and unless
enjoined will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-
5, 17 C.F.R. § 240.10b-5, thereunder.

## THIRTEENTH CLAIM FOR RELIEF

Nwaigwe Aided and Abetted Violations of
Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

181.    The Commission realleges and incorporates by reference each and every

allegation contained in the paragraphs above.

182.    Watley Group, Deakins, Fellus, Geller, Keith Rogers, and Bryan Rogers, among

others, in connection with the purchase or sale of securities, by the use of the means or

instrumentalities of interstate commerce, or of the mails, or of any facility of any national

securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue

statements of material facts or omitted to state material facts necessary in order to make the

statements made, in the light of the circumstances under which they were made, not misleading;

or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon

the purchasers or sellers of numerous securities, and therefore violated Section 10(b) of the

Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

183.    Nwaigwe knew that Watley Group, Watley, and its officers and/or employees

engaged in a fraudulent trading ahead scheme involving Watley's day traders trading ahead of

institutional customer orders based on information regarding these orders received from the

Brokers.

184.    Nwaigwe substantially assisted the fraudulent activity described above.  For

example, Nwaigwe concealed the Watley traders' audio access to squawk boxes from the NASD,

and other regulatory agencies.

185.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason

of the foregoing, Nwaigwe, singly or in concert, directly or indirectly, aided and abetted and

36

unless enjoined will again violate Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## FOURTEENTH CLAIM FOR RELIEF

### Coughlin Violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder

186.    The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

187.    By virtue of the conduct described above, Coughlin, in the offer or sale, and in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) obtained money or property by, or otherwise made, untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a fraud or deceit upon the purchasers or sellers of numerous securities.

188.    As part of and in furtherance of this violative conduct, Coughlin participated in a fraudulent scheme and/or engaged in insider trading. Through this scheme, Coughlin, in breach of his duty to Merrill's customers, and/or in breach of his duty to his employer, Merrill, secretly communicated confidential information concerning Merrill's institutional orders to Watley and its traders, who then used this information to trade ahead of customer orders.

189.    As part of and in furtherance of this violative conduct, Coughlin, in breach of his fiduciary duty to Merrill's customers, and/or in breach of his duty to his employer, Merrill, communicated material, non-public information concerning customer orders to Watley and its traders.

37

190.     Coughlin knew, or was reckless in not knowing, that he was breaching a duty by conveying confidential customer order information to the Watley traders, and in accepting compensation from Geller in exchange for providing this information.

191.     Coughlin also knew, or was otherwise reckless in not knowing, that he was defrauding Merrill, and/or its customers, through this scheme.

192.     This scheme was material.  For example, Merrill's customers would have reasonably wanted to know that Coughlin was secretly disclosing their confidential orders to day traders whose intent was to trade ahead of these orders.

193.     By reason of the acts and practices described above, Coughlin, singly or in concert, directly or indirectly, violated, and unless permanently enjoined will again violate, Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

## FIFTEENTH CLAIM FOR RELIEF

Deakins, Fellus, Geller, Leonard, Steven Malin,
Robert Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers
Aided and Abetted Violations of Section 15(c) of the Exchange Act

194.     The Commission realleges and incorporates by reference each and every allegation contained in the paragraphs above.

195.     Watley, a broker-dealer, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of any national securities exchange: (1) employed devices, schemes, or artifices to defraud; (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (3) engaged in acts, practices, or courses of business that operated as a

fraud or deceit upon the purchasers or sellers of numerous securities, and therefore violated Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

196.    Deakins, Fellus, Geller, Leonard, Steven Malin, Robert Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers knew that Watley engaged in a fraudulent trading ahead scheme involving Watley's day traders trading ahead of institutional customer orders based on information regarding these orders received from the Brokers.

197.    Deakins, Fellus, Geller, Leonard, Steven Malin, Robert Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers substantially assisted the fraudulent activity described above. Among other things, these Defendants established, managed, and/or supervised the trading ahead conduct, and/or personally traded ahead of institutional orders broadcast over squawk boxes.

198.    Pursuant to Section 20(e) of the Exchange Act, 15 U.S.C. § 78t(e), and by reason of the foregoing, Deakins, Fellus, Geller, Leonard, Steven Malin, Robert Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers, singly or in concert, directly or indirectly, aided and abetted and unless enjoined will again aid and abet violations of Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

## RELIEF SOUGHT

**WHEREFORE**, the plaintiff Commission respectfully requests that this Court enter a Final Judgment:

A.    Permanently enjoining Watley Group, Coughlin, Deakins, Fellus, Geller, Leonard, Robert Malin, Steven Malin, Picone, Bryan Rogers, and Keith Rogers, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Sections

10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

    B.      Permanently enjoining Nwaigwe, his agents, servants, employees, and attorneys, and all persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Sections 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5, thereunder.

    C.      Permanently enjoining Coughlin, Deakins, Fellus, Geller, Leonard, Robert Malin, Steven Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers, their agents, servants, employees, and attorneys, and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 15(c) of the Exchange Act, 15 U.S.C. § 78o(c).

    D.      Ordering Watley Group, Coughlin, Deakins, Fellus, Geller, Leonard, Robert Malin, Steven Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers to disgorge all ill-gotten gains they received as a result of the violations alleged in this Complaint.

    E.      Ordering Watley Group, Coughlin, Deakins, Fellus, Geller, Leonard, Robert Malin, Steven Malin, Nwaigwe, Picone, Bryan Rogers, and Keith Rogers to pay civil money penalties pursuant to Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Sections 21(d) and/or 21A(a) of the Exchange Act, 15 U.S.C. § 78u(d) and 15 U.S.C. § 78u-1.

    F.      Permanently barring Robert Malin, Steven Malin, and Picone, pursuant to Section 20(e) of the Securities Act, 15 U.S.C. 77t(e), and Section 21(d)(2) of the Exchange Act, 15 U.S.C. § 78u(d)(2), from serving as an officer or director of any issuer that has a class of

securities registered under Section 12 of the Exchange Act, 15 U.S.C. § 78l, or that is required to

file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d).

      G.      Granting such other relief as the Court shall deem just and proper.

Dated:      March 21, 2006
            New York, New York

                        Respectfully submitted,

      By:      MARK K. SCHONFELD (MS-2798)

              Attorney for Plaintiff
              SECURITIES AND EXCHANGE COMMISSION
              Northeast Regional Office
              3 World Financial Center
              New York, NY 10281
              (212) 336-0140 (Robert H. Murphy)

Of Counsel:
      Helene T. Glotzer
      Kay L. Lackey
      Robert H. Murphy
      Sandeep M. Satwalekar
      Jack Kaufman
      William Finkel